IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ALL ENERGY CORPORATION,<br>Plaintiff,<br>v.<br>ENERGETIX, LLC, ET AL.,<br>Defendants. | No. 4:11-CV-00617-JEG-CFB<br><br>SECOND AMENDED COMPLAINT AND JURY DEMAND |

COMES NOW Plaintiff, All Energy Corporation, and for its Complaint against each of the Defendants, states as follows:

**PARTIES, VENUE AND JURISDICTION**

1. Plaintiff All Energy Corporation f/k/a All Fuels and Energy Company ("All Energy") is a duly authorized Delaware Corporation, with its principal place of business in Iowa. All Energy is engaged in the business of developing ethanol production facilities, among other things.

2. Defendant Energetix, LLC ("Energetix") is a duly authorized Limited Liability Company in the State of Indiana, with its principal place of business in Michigan. Energetix has been served and made an appearance in this action.

3. Defendant Energetix Holdings II, LLC ("Holding") is a duly authorized Limited Liability holding company in the State of Indiana, the subsidiary of which (Energetix) is engaged in the biofuels industry. Holding has been served and made an appearance in this action.

4. Defendant Mitch Miller, upon information and belief, is a Member of both Defendant Energetix entities with the actual and apparent authority to bind the Energetix entities. Mitch Miller has been served and made an appearance in this action and is not a resident of the State of Iowa.

5. Defendant Mick Miller, upon information and belief, is a Member of both Defendant Energetix entities with the actual and apparent authority to bind the Energetix entities. Mick Miller is not a resident of the State of Iowa.

6. Defendant Jason Jerke, upon information and belief, is a Member of both Defendant Energetix entities with the actual and apparent authority to bind the Energetix entities. Jason Jerke is not a resident of the State of Iowa.

7. Defendant Red River Ethanol of NC, LLC is a duly authorized Limited Liability Company in the State of North Carolina, with its principal place of business in North Carolina. Upon information and belief, Red River Ethanol of NC, LLC is a part owner of Red River Energy, LLC.

8. Jack Carlisle, upon information and belief, is a member of Red River Ethanol of NC, LLC. He is also not a resident of the State of Iowa.

9. Greg Carlisle, upon information and belief, is a member of Red River Ethanol of NC, LLC and a part owner of Red River Energy, LLC. He is also not a resident of the State of Iowa.

10. Harvest Energy, LLC is a duly authorized Limited Liability Company in the State of North Carolina, with its principal place of business in North Carolina. Upon information and belief, Harvest Energy, LLC is a part owner of Red River Energy, LLC.

11. Clif Bullard, Jr., upon information and belief, is a Member of Harvest Energy, LLC. He is also not a resident of the State of Iowa.

12. Warrenn Anderson, upon information and belief, represented Energetix, himself, and the Breckenridge Group (described below) during the relevant time periods and is not a resident of the State of Iowa. He is also a part owner of Red River Energy, LLC.

13. Yaggie Investment Fund II, LLC is a duly authorized Limited Liability Company in the

State of Minnesota with its principal place of business in Minnesota. Upon information and belief, Yaggie Investment Fund II, LLC is also a part owner of Red River Energy, LLC.

14. David Yaggie, upon information and belief, is a Member of Yaggie Investment Fund II, LLC. He is also not a resident of the State of Iowa.

15. Richard Yaggie, upon information and belief, is a Member of Yaggie Investment Fund II, LLC. He is also not a resident of the State of Iowa.

16. Michael Yaggie, upon information and belief, is a Member of Yaggie Investment Fund II, LLC. He is also not a resident of the State of Iowa.

17. The court has diversity jurisdiction over this dispute and venue is proper in the United States District Court for the Southern District of Iowa pursuant to the parties' citizenship as well as by contractual agreement. In particular, the parties' written Non-Disclosure Agreement that is central to this matter (hereinafter "NDA"), provides that "All actions in connection with this Agreement shall be brought only in the state or federal courts sitting in Des Moines, Iowa" and governed by and construed in accordance with the laws of the State of Delaware. A true and correct copy of the NDA is attached hereto and incorporated herein by reference. (Exhibit A, NDA).

**Facts**

18. On or about July 2, 2011, Mitch Miller and/or Energetix, LLC and/or Energetix Holdings II, LLC executed the aforementioned NDA. (Defendants Energetix, LLC and Energetix Holdings II, LLC are hereafter referred to collectively as "Energetix").

19. Among other provisions, the NDA provides in pertinent part:

1. Confidential Information:

"Confidential Information" shall mean any and all information and documents provided

> by the Disclosing Party to the Receiving Party, either directly or indirectly … "Confidential Information" includes, without limitation, technical data, trade secrets, plans for products or services, company or supplier lists, customer lists, customer information, marketing plans … financial documents or data … The Receiving Party shall not use or disclose and shall keep confidential any and all Confidential Information other than to explore potential financing between the parties … The Receiving Party may disclose Confidential Information only to its directors, officers, affiliates, …, members, partners, potential financing sources, attorneys, …, consultants, agents or advisors to whom such disclosure is necessary to evaluate, and engage in discussions concerting, the potential business relationship …, who are bound by the terms hereof or similar confidentiality obligations.

(Exhibit A, ¶ 1)

20. The NDA also provides:

> 6. Non-Circumvention:
>
> During the term of this agreement and for a period of 12 months after its termination, Interested Party hereby agrees not to, directly or indirectly, without the written consent of All Fuels & Energy Company: (a) solicit, contact, negotiate, or form any agreements with any of All Fuels & Energy Company's acquisition target, Tristate Financial, LLC DBA North Country Ethanol in bankruptcy, independent of ALL Fuels & Energy Company.

(Exhibit A, ¶ 6)

21. The Non-Solicitation provision in the NDA reads as follows:

> During the term of this Agreement and for a period of twenty four (12) [sic] months thereafter, neither party hereto shall, directly or indirectly, recruit, solicit or otherwise induce or influence any person or entity which is, or was at any time during the term of this Agreement, a customer, supplier, employee, consultant, sales agent or independent contractor of the other party hereto or any other person or entity which has a business, agency or employment relationship with such other party or its affiliates to discontinue or reduce the extent of such relationship.

22. The NDA pertains to an ethanol production plant located at 47333 104th Street, Rosholt, South Dakota (hereafter "North Country Ethanol plant").

23. At the time the NDA was executed, the North Country Ethanol plant was operated by U.S. Bankruptcy Trustee Thomas Stalnaker, for the Tri-State Financial, LLC bankruptcy estate

in the U.S. District Bankruptcy Court in and for Nebraska.

24. On or about June 30, 2011, the Trustee issued a Notice of Abandonment indicating his intent to abandon the plant on July 21, 2011 if not sold.

25. In 2008, the North Country Ethanol plant was identified by All Energy's board as the acquisition target that subsequently became the subject of the NDA.

26. From 2008 and after, All Energy's CEO and President, Dean Sukowatey, and All Energy's COO and director, James Broghammer, conducted extensive due diligence into the North Country Ethanol plant, including but not limited to investigation into its operations, finances, financial condition, profitability, energy production, and corn supply.

27. All Energy also assembled a team of experienced managers for the North Country Ethanol plant in preparation for operating the plant upon completion of the acquisition.

28. By March 2011, All Energy had obtained commitments from key management personnel, namely Thomas G. Lane, Leon Anderson, Timothy Simonson, and James Broghammer, who were to serve as management team members of the North Country Ethanol plant upon completion of All Energy's acquisition.

29. In preparation for acquisition of the plant, All Energy obtained a firm and binding commitment for financing of $5,000,000 from Community Business Lenders (hereinafter "CBL"). This binding commitment was in place as of early 2011 and before the NDA was executed.

30. At a meeting on July 7, 2011, in reliance upon the execution of the NDA, All Energy first disclosed Confidential Information to Mitch Miller and his brother, Mick Miller, all as agents for Energetix, LLC and Energetix Holdings II, LLC, regarding the North Country Ethanol plant. Prior to executing the NDA, plaintiff made no disclosure of Confidential Information to these

parties or otherwise.

31. All Energy disclosed Confidential Information it had assembled during the course of its three years of due diligence into acquiring the plant, including but not limited to expected purchase price, deficiencies of the plant, capital required for repairs and maintenance, financial pro formas, lender-related materials as well as all the confidential information provided to All Energy by the Bankruptcy Trustee pursuant to All Energy's agreement of non-disclosure in favor of the Trustee.

32. On or about July 7, 2011, All Energy also introduced its key management personnel, Tom Lane, Leon Anderson and Timothy Simonson to Mitch Miller and his brother, Mick Miller, and Energetix.

33. Approximately one week following the parties' first meeting on July 7, 2011, All Energy's Dean Sukowatey met with Mick Miller and Attorney Warrenn Anderson, at the Denco II Ethanol plant in Minnesota which was being operated by Energetix.

34. The purpose of the meeting was to further discuss the joint venture to purchase the North Country Ethanol plant.

35. Mick Miller identified Warrenn Anderson as, and Warrenn Anderson held himself out as, an "investor". However, during the negotiating process, Warrenn Anderson also stated he represented a group of investors identified as the "Breckenridge Group."

36. Mitch Miller and Jason Jerke, both members of Energetix, LLC and/or Energetix Holdings II, LLC, participated in the parties' meeting at the Denco II plant by telephone.

37. Pursuant to the NDA, and based on the shared Confidential Information, the parties agreed to form a joint venture to purchase the North Country Ethanol plant.

38. On or about July 9, 2011, Mitch Miller authored and sent a document to All Energy

containing the essential terms for the purchase of the North Country Ethanol plant.

39. Pursuant to the parties' agreement, All Energy was to provide its $5,000,000 financing commitment from CBL – which it did, and Energetix, LLC and/or Energetix Holdings II, LLC was to provide $4,000,000 in cash.

40. Energetix, LLC's and/or Energetix Holdings II, LLC's cash contribution for the acquisition was to come from investors or potential funding sources selected by Energetix, LLC and/or Energetix Holdings II, LLC.

41. Energetix, LLC and/or Energetix Holdings II, LLC did not disclose the names of its investors or potential funding sources to All Energy, other than Warrenn Anderson and the "Breckenridge Group" that Anderson "represented".

42. Thereafter the parties negotiated the terms for the acquisition, including All Energy and the Energetix entities' respective ownership interest in the North Country Ethanol plant.

43. The parties also negotiated their management roles and fees as well as the joint venture's board member distribution.

44. On or about July 18, 2011, Mick Miller, on behalf of the Defendant Energetix entities, sent to All Energy's Dean Sukowatey the "Final Term Sheet" for acquisition of the North Country Ethanol plant. (See Exhibit B – Attached hereto and incorporated by reference).

45. In the transmittal of the "Final Term Sheet" Mick Miller stated "[a]ttached is a redlined version of the term sheet and a clean PDF. If this is acceptable, please execute and return a scanned copy via e-mail and two originals to Mitch at:

> Energetix, LLC
> ATTN: Mitch Miller
> 8700 Conservancy Drive NE
> Ada, MI 49301"

46. The "Final Term Sheet" sent to All Energy included, *inter alia*, the following terms:

1. Purchase the Plant for $5 MM – term loan from Mark Killian with Community Business Lenders (CBL)

    a. ALL ENERGY primary responsibility.

2. Raise $4 MM equity – working capital – each $1 MM equity represents 15% ownership

    a. Energetix primary responsibility

    b. Transaction will be 100% private, no public offering.

3. Energetix, LLC or other Energetix Holding company as determined by Energetix, LLC and ALL ENERGY – 50/50 ownership subject to ownership dilution described in paragraph 2, as project developers –

    Energetix, LLC or other Energetix Holding company as determined by Energetix, LLC received 19.99% ownership

    All Energy receives 20.01% ownership.

47. The "Final Term Sheet" also includes agreed-upon terms for management roles and fees as well as the joint venture's board member distribution.

48. At that time, the parties agreed to the material terms and conditions of the parties' joint venture for the acquisition of the North Country Ethanol plant.

49. The parties also discussed and stated their understanding that the Bankruptcy Trustee's authority to sell the plant expired on July 21, 2011.

50. The parties expressed their understanding and agreement that July 20, 2011 was their deadline for funding the acquisition.

51. Pursuant to the parties' agreement, Energetix, LLC and/or Energetix Holdings II, LLC agreed to transfer certain funds to the bankruptcy trustee and certain funds to the escrow agent by the July 20, 2011 deadline.

52. On or about July 19, 2011, All Energy and its attorney, Eric Newlan, participated in a telephone conference with the Bankruptcy Trustee, Mitch Miller, and Warrenn Anderson who then represented himself as an attorney appearing on behalf of Energetix, and also on behalf of investors, himself, and the "Breckenridge Group". During the July 19th conference call, the Trustee stated that North Country Ethanol's first secured creditor was meeting with another buyer (other than All Energy's and Energetix, LLC's and/or Energetix Holdings II, LLC's joint venture).

53. On July 20, 2011, Mitch Miller wrote to All Energy's Dean Sukowatey: "our investors will not release funds with the current ownership structure and fees," and the Defendant Energetix entities failed to make the agreed upon transfer of funds on that date.

54. Later in the day of July 20, 2011, the Bankruptcy Trustee revealed to All Energy that the Trustee was '"entering into an arrangement with another party" and "will negotiate exclusively with that party" for the purchase of the North Country Ethanol plant.

55. All Energy subsequently learned that the referenced "other party" was a group led by Jack Carlisle and Greg Carlisle and that Warrenn Anderson was involved with them.

56. Upon information and belief, Jack and Greg Carlisle formed Red River Energy, LLC to purchase the North Country Ethanol plant.

57. On or about August 8, 2011, Red River Energy, LLC executed a Purchase Agreement for the North Country Ethanol plant.

58. At that time, the Bankruptcy Trustee agreed upon a purchase price for the plant of $4,500,000 from Red River Energy, LLC (members Jack and Greg Carlisle), and represented to the United States Bankruptcy Court for the District of Nebraska that this amount "represents the best purchase price to be obtained" for the North Country Ethanol plant.

59. On or about September 21, 2011, Red River Energy, LLC and the Bankruptcy Trustee finalized the purchase of the North Country Ethanol plant. At the hearing/meeting related to same, Warrenn Anderson held himself out as the attorney for Red River Energy, LLC.

60. On information and belief, Jason Jerke and/or Mitch Miller and/or Mick Miller and/or Energetix, LLC (and/or Energetix Holdings II, LLC) and/or their affiliates have entered into an agreement with Red River Energy, LLC to manage the North Country Ethanol plant.

61. On information and belief, Jason Jerke and/or Mitch Miller and/or Mick Miller and/or Energetix, LLC and/or Energetix Holdings II, LLC and/or their affiliates currently manage the North Country Ethanol plant.

62. On information and belief, Jason Jerke and/or Mitch Miller and/or Mick Miller and/or Energetix, LLC and/or Energetix Holdings II, LLC and/or their affiliates including Warrenn Anderson have an ownership interest in the North Country Ethanol plant.

63. Tom Lane, Leon Anderson and Timothy Simonson were solicited by Energetix, LLC and/or Energetix Holdings II, LLC and/or their affiliates to work at the North Country Ethanol plant and Leon Anderson and Timothy Simonson are currently employed by Energetix, LLC and/or Energetix Holdings II, LLC at the North Country Ethanol plant.

64. On information and belief, other individuals who have an ownership interest in the North Country Ethanol plant include: Warrenn Anderson; Jack and Greg Carlisle either individually or through Red River Ethanol of NC, LLC, which they control; Clif Bullard, Jr. either individually or through Harvest Energy, LLC, which he controls; David Yaggie, Richard Yaggie and/or Michael Yaggie either individually or through Yaggie Investment Fund II, LLC, which they control; other "Breckenridge Group" members; and/or others.

65. At no time prior to the July 20, 2011 deadline for purchase of the North Country Ethanol

plant did Jason Jerke, Mitch Miller, Mick Miller, Energetix's lawyer Warrenn Anderson or any other agents or affiliates of Energetix, LLC and/or Energetix Holdings II, LLC reveal to All Energy that they were in contact with other potential investors for a newly formed entity to purchase the North Country Ethanol plant.

66. From July 7 through July 20, 2011, Jason Jerke, Mick Miller, Mitch Miller and/or Energetix, LLC and/or Energetix Holdings II, LLC and/or their agents and affiliates deceived All Energy by leading its principals to believe that they were working to meet the July 20, 2011 deadline, while simultaneously negotiating with Jack Carlisle, Greg Carlisle, Warrenn Anderson, Clif Bullard, Richard Yaggie, David Yaggie, Michael Yaggie, and/or others to structure an alternate deal that did not include All Energy.

67. On information and belief, Jack Carlisle, Greg Carlisle, Clif Bullard, David Yaggie, Richard Yaggie and Michael Yaggie had existing business relationships with Jason Jerke, Mick Miller, Mitch Miller, Energetix, LLC, Energetix Holdings II, LLC, and/or Warrenn Anderson.

68. In an August 5, 2011 letter from Energetix, LLC and/or Energetix Holdings II, LLC's lawyer, the lawyer admits that Energetix, LLC and/or Energetix Holdings II, LLC did "discuss the general structure of equity participation" in regard to the North Country Ethanol plant with Jack Carlisle.

69. On or about July 27, 2011, Jack Carlisle's lawyer informed counsel for All Energy that, "In fact, it was Jack Carlisle who first alerted Mitch Miller and who inquired of Mr. Miller's interest in managing the plant should a Carlisle company purchase the plant. Mr. Carlisle arranged his own meetings and negotiations with Thomas Stalnaker [Bankruptcy Trustee] independent of Energetix."

70. Upon information and belief, at the time the NDA was signed, it was foreseeable that

Energetix, through its agents and affiliates including but not limited to its attorney Warrenn Anderson, would contact and distribute Confidential Information to Jack Carlisle, Greg Carlisle, Clif Bullard, Jr., David Yaggie, Richard Yaggie, and Michael Yaggie among others because, among other reasons, Energetix had previous business relationships with those individuals involving investments and operations of ethanol plants.

71. Upon information and belief, Defendants, and each of them, all received a substantial benefit from the NDA through reception of the aforementioned Confidential Information, including but not limited to, the purchase price of the plant. They then used this information to invest and take an ownership interest in Red River Energy, LLC, which operates the North Country Ethanol plant to their mutual benefit.

72. Upon information and belief, Warrenn Anderson learned of the Confidential Information through his representation of or affiliation with Energetix and shared the Confidential Information with David Yaggie, Richard Yaggie, Michael Yaggie, Jack Carlisle and/or Greg Carlisle and/or others to all of their mutual benefit through their direct ownership in the North Country Ethanol plant and/or their control and interest in entities, including Harvest Energy, LLC and Yaggie Investment Fund II, LLC with ownership interest in the North Country Ethanol plant via Red River Energy, LLC.

73. Upon information and belief, Jason Jerke, Mick Miller, and Mitch Miller shared Confidential Information with Jack and Greg Carlisle by, including but not limited to, sending an email dated July 14, 2011 that listed the pros and cons of the North Country Ethanol plant.

74. Upon information and belief, Jack and Greg Carlisle created Red River Ethanol of NC, LLC in order to invest in Red River Energy, LLC.

75. Upon information and belief, Clif Bullard, Jr. created Harvest Energy, LLC in order to

invest in Red River Energy, LLC.

76. Upon information and belief, David Yaggie, Richard Yaggie and Michael Yaggie created Yaggie Investment Fund II, LLC in order to invest in Red River Energy, LLC.

77. Upon information and belief, Defendants, and each of them, became bound to the NDA by virtue of their status as affiliates, partners, potential financing sources, attorneys, consultants, agents or advisors and/or being closely bound to the agreement through receiving a benefit from the agreement or it being foreseeable that they would be bound by the NDA.

## Causes of Action

### I. Breach of Contract

78. All Energy repleads paragraphs 1-77 of this Complaint as if fully set forth herein.

79. Defendants, and each of them, through their agents, members, affiliates, representatives or otherwise entered into the NDA attached as Exhibit "A" and incorporated by reference and/or became bound to the NDA through their status as affiliates, partners, potential financing sources, attorneys, consultants, agents or advisors and/or by being a closely related party to the NDA.

80. Defendants Energetix, LLC, Energetix Holdings II, LLC, Jason Jerke, Mick Miller, Mitch Miller, and/or Warrenn Anderson breached the NDA in the following ways, without limitation:

(a) Defendant(s) breached the Confidentiality provision by disclosing Confidential Information, which All Energy disclosed to Defendant(s), to third parties including but not limited to Jack and Greg Carlisle, Red River Ethanol of NC, LLC, Harvest Energy, LLC, Clif Bullard, Jr., Warrenn Anderson, Yaggie Investment Fund II, LLC, David Yaggie, Richard Yaggie, Michael Yaggie, and/or Red River Energy, LLC and their affiliates;

(b) Defendant(s) breached the Non-Solicitation provision by soliciting Tom Lane, Leon Anderson, and Timothy Simonson, each of whom had an existing business relationship with All Energy, two of whom now work for Defendant(s) at the North Country Ethanol plant;

(c) Defendant(s) breached the Non-Circumvention provision by converting the North Country Ethanol plant business opportunity to itself with an entity or individuals other than All Energy;

(d) Defendant(s) breached the Non-Circumvention provision by operating the North Country Ethanol plant for Red River Energy, LLC.

81. Defendants, Red River Ethanol of NC, LLC, Jack Carlisle, Greg Carlisle, Harvest Energy, LLC, Clif Bullard, Jr., Yaggie Investment Fund II, LLC, David Yaggie, Richard Yaggie, and/or Michael Yaggie breached the NDA in the following ways, without limitation:

(a) Defendant(s) breached the Non-Solicitation provision by soliciting Tom Lane, Leon Anderson, and Timothy Simonson, each of whom had an existing business relationship with All Energy, two of whom now work for Defendant(s) at the North Country Ethanol plant;

(b) Defendant(s) breached the Non-Circumvention provision by converting the North Country Ethanol plant business opportunity to itself with an entity or individuals other than All Energy;

(c) Defendant(s) breached the Non-Circumvention provision by operating the North Country Ethanol plant for Red River Energy, LLC.

82. All Energy suffered damages as a result of Defendants' breaches of the NDA. These damages are compensable under Delaware law. All Energy's demands include compensation based upon its reasonable expectations *ex ante* measured by the amount of money that would put All Energy in the same position as if the Defendants had performed their contract with All Energy. Plaintiff therefore is entitled to monetary damages both for (1) the failure of the Defendants to compensate All Energy for its valuable introduction to and work with the Trustee; and (2) the greater of All Energy's reasonable expectations or its lost profits and opportunities caused by the Defendants' usurpation of the opportunity. Plaintiff also is entitled to attorney fees.

WHEREFORE, Plaintiff All Energy prays that the Court take into account all the

circumstances of the breach, including willfulness, and that it enter judgment in All Energy's favor and against all Defendants, jointly and severally, with costs and for such other relief as the Court deems appropriate.

## II. Unjust Enrichment

83. All Energy repleads paragraphs 1-82 of this Complaint as if fully set forth herein.

84. All Energy's due diligence into the North Country Ethanol plant acquisition opportunity led to the gathering of and/or creation of Confidential Information.

85. Contrary to their agreement and obligation not to do so, Defendants, and each of them, used the Confidential Information to structure an alternate deal with Red River Energy, LLC and/or its affiliates.

86. Defendants were unjustly enriched by the Confidential Information disclosed by All Energy.

87. Defendants used the Confidential Information disclosed by All Energy to structure an alternate deal with Red River Energy, LLC and/or its affiliates.

88. All Energy was circumvented and prevented from acquisition of the North Country Ethanol plant by Defendants' acts and/or omissions.

89. All Energy suffered damages as a result of Defendants' acts and/or omissions.

WHEREFORE Plaintiff All Energy prays that the Court take into account all the circumstances of the conduct of the Defendants, including willfulness, and that the Court enter judgment in its favor and against all Defendants, jointly and severally, with costs and for such other relief as the Court deems appropriate.

## III. Breach of Implied Covenant of Good Faith and Fair Dealing

90. All Energy repleads paragraphs 1-89 of this Complaint as if fully set forth herein.

91. In addition to the contractual relationship(s) that were formed and/or discussed between the parties, an implied covenant of good faith and fair dealing was formed between the Plaintiff and Defendants, and each of them, as they exchanged Confidential Information and explored the potential acquisition of the North Country Ethanol plant.

92. Defendants' involvement with the operation of the North Country Ethanol plant without All Energy's involvement violates the implied covenant of good faith and fair dealing that existed between the parties.

93. All Energy reasonably relied upon the implied covenant of good faith and fair dealing it had with the Defendants.

94. All Energy has suffered damages as a result of Defendants' acts and/or omissions.

WHEREFORE Plaintiff All Energy prays that the Court take into account all the circumstances of the Defendants' misconduct, including willfulness, and that the Court enter judgment in its favor and against Defendants, jointly and severally, with costs and for such other relief as the Court deems appropriate.

## IV. Civil Conspiracy

95. All Energy repleads paragraphs 1-94 of this Complaint as if fully set forth herein.

96. All Defendants, and each of them, entered into an illicit and secret agreement with themselves and others to convert the North Country Ethanol plant business opportunity to themselves and to the exclusion of the Plaintiff. As a result, the Defendants are jointly and severally liable for the acts of each of them and for the acts of all others in the conspiracy.

97. It can be deduced and inferred from the facts pleaded in this Complaint that the Defendants agreed to (a) extract as much Confidential Information as possible from Plaintiff by signing the NDA with Plaintiff without any intention to be bound by it; (b) obtain the necessary

introduction to the owner of the North Country Ethanol plant and information concerning the sale price of the plant; (c) buy enough time to arrange their own financing for the purchase of the North Country Ethanol plant; and (d) run out the clock on the Trustee's abandonment deadline to ensure that Plaintiff would be unable to consummate the purchase of the North Country Ethanol plant.

98. The object of the Defendants' illegal conspiracy was to defraud Plaintiff and steal or convert the business opportunity possessed by Plaintiff to purchase the North Country Ethanol plant.

99. Defendants acted with intent and malice in entering into and carrying out the objects of the conspiracy.

100. Defendants acted in willful disregard of the NDA and the fiduciary duties Defendants owed to Plaintiff.

101. All Energy suffered damages as a result of Defendants' illegal conspiracy, and All Energy is entitled to punitive or exemplary damages without limitation.

WHEREFORE Plaintiff All Energy prays that the Court take into account all the circumstances of the Defendants' misconduct, including willfulness and malice, and that the Court enter judgment in its favor and against Defendants, jointly and severally, with costs and for such other relief as the Court deems appropriate or as may be just and proper under the circumstances.

## V. Misappropriation of a Trade Secret

102. All Energy repleads paragraphs 1-101 of this Complaint as if fully set forth herein.

103. Defendants, and each of them, misappropriated Plaintiff's confidential and trade secret information, including but not limited to, the purchase price of the North Country Ethanol plant

and the other aforementioned Confidential Information, in order to purchase and operate the North Country Ethanol plant.

104. Defendants' misappropriation of Plaintiff's confidential and trade secret information included, without limitation:

(a) Acquiring the confidential and trade secret information knowing that the information was acquired by improper means, specifically in violation of obligations created under the NDA as discussed in the foregoing paragraphs and/or acquiring the confidential and trade secret information under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(b) Disclosing and/or using the confidential and trade secret information after using improper means to acquire the information or knowing that improper means were used to secure the information, including without limitation, disclosure and use of information concerning the North Country Ethanol plant in violation of the NDA knowing that it was secured in violation of the NDA;

(c) Disclosing or using the confidential and trade secret information when, at the time of the disclosure or use, he or it knew that the trade secret was derived from or through a person who has a duty to maintain the trade secret's secrecy or limit its use, specifically duties and obligations created under the NDA; and/or

(d) Disclosing or using the confidential and trade secret information, knowing, before a material change in his or its circumstances occurred, that the trade secret has been acquired by accident or mistake.

105. Defendants' misappropriation of Plaintiff's confidential and trade secret information was willful and malicious.

106. As a consequence of Defendants' misappropriation of Plaintiff's confidential and trade secret information, Plaintiff has suffered and continues to suffer substantial harm.

WHEREFORE the Plaintiff, respectfully requests this Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, on Plaintiff's misappropriation of trade secret claim for damages in an amount that will reasonably compensate Plaintiff for the losses it

has sustained, exemplary damages in the maximum amount permitted by law, attorney fees and costs, and for such other relief as this Court deems just and appropriate.

### VI. Attorney Fees

107. All Energy is entitled to recover, and hereby demands all of its expenses, including, without limitation, reasonable attorney fees, as provided for by applicable law, including but not limited to under paragraph 14(e) of the parties' NDA.

### VII. Jury Demand

108. Plaintiff demands a jury trial under the Seventh Amendment to the United States Constitution.

### VIII. Conditions Precedent

109. All conditions precedent have been performed or occurred.

### IX. Demand for Relief

110. Plaintiff All Energy demands trial by jury and judgment against the Defendants and each of them for the causes of action more fully set out above and for the following relief:

a. Actual damages,

b. Punitive and exemplary damages,

c. Any equitable relief to which it may be entitled,

d. Pre and post-judgment interest,

e. Attorney fees, costs and expenses, including expert witness fees and expenses, and

f. Any and all other legal, equitable, or other relief that the court deems available to the Plaintiff.

s/ Brian P. Rickert
Brian Rickert, AT0006633
Sean P. Moore, AT0005499
Jonathan M. Gallagher, AT0009845

BROWN, WINICK, GRAVES, GROSS,
BASKERVILLE AND SCHOENEBAUM, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone: 515-242-2400
Facsimile: 515-283-0231
E-mail: rickert@brownwinick.com
moore@brownwinick.com
gallagher@brownwinick.com

ATTORNEYS FOR PLAINTIFF

Certificate of Service

The undersigned hereby certifies that on the 7th day of December, 2012, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which, pursuant to Local Rule 5.3(k)(1), will send a notice of electronic filing to the following:

Stanley J. Thompson
Joseph A. Happe
Davis Brown Koehn Shors & Roberts, P.C.
215 10th St., Ste. 1300
Des Moines, IA 50309
ATTORNEYS FOR DEFENDANTS

*/s/* Crystal Kansala[1]

[1] This document has been signed, filed and served electronically.

# EXHIBIT
# A

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("Agreement") is entered into as of the later of the dates set forth on the signature page hereto by and between ALL Fuels & Energy Company, a Delaware corporation, on behalf of itself and its affiliates, and the undersigned individual or entity, on behalf of itself and its affiliates (collectively, "Interested Party"). The term "it" in reference to the Receiving Party (as defined below) shall be read as "he" or "she" in the case of an individual Receiving Party.

In consideration of the mutual promises and covenants contained in this Agreement and the mutual disclosure of Confidential Information (as defined herein) by each party (the "Disclosing Party") to the other party (the "Receiving Party"), the parties hereto agree as follows:

1. <u>Confidential Information</u>. "Confidential Information" shall mean any and all information and documents provided by the Disclosing Party to the Receiving Party, either directly or indirectly, in writing, electronically, orally, by inspection of tangible objects, or otherwise unless such information has been explicitly designated by the Disclosing Party as not Confidential Information. "Confidential Information" includes, without limitation, technical data, trade secrets, plans for products or services, company or supplier lists, customer lists, customer information marketing plans, software, source code or documentation for software, financial documents or data, inventions, processes, technology and designs. Confidential Information disclosed to the Receiving Party by any officer, director, employee, agent or affiliate of the Disclosing Party is covered by this Agreement. The Receiving Party shall not use or disclose and shall keep confidential any and all Confidential Information other than to explore a potential financing between the parties ("Transaction"), and shall use the same care as the Receiving Party uses to maintain the confidentiality of its confidential information. The Receiving Party may disclose Confidential Information only to its directors, officers, affiliates, employees, members, partners, potential financing sources, attorneys, accountants, insurers, rating agencies, consultants, agents or advisors to whom such disclosure is necessary to evaluate, and engage in discussions concerning, the potential business relationship (any such persons to whom the Receiving Party has provided Confidential Information hereinafter, collectively, "Representatives"), or to carry out the terms of such relationship, who are bound by the terms hereof or similar confidentiality obligations. The Receiving Party acknowledges that the remedy at law for any breach of the foregoing provisions of this paragraph may be inadequate and that the Disclosing Party shall be entitled to seek injunctive relief against any such breach or threatened breach, without posting any bond, in addition to any other remedy available to it. Notwithstanding any other provision of this Agreement, (a) the Receiving Party may disclose Confidential Information pursuant to any governmental, judicial or administrative order, subpoena or discovery request, provided that the Receiving Party to the extent practicable and legally permissible uses reasonable efforts to notify the Disclosing Party sufficiently in advance of such order, subpoena, or discovery request so that the Disclosing Party may seek, at its sole cost and expense, to object to such order, subpoena or request, or to make such disclosure subject to a protective order or confidentiality agreement, and (b) the Receiving Party may disclose to any and all persons, without limitation of any kind, information concerning the tax treatment and tax structure (as such terms are defined in Treasury Regulation Section 1.6011-4(c)) of any transaction whether or not such tax treatment or tax structure would otherwise constitute Confidential Information.

2. <u>Exclusion</u>. "Confidential Information" shall not include information that (a) at the time of use or disclosure by the Receiving Party, is in the public domain through no breach of this agreement by the Receiving Party; (b) becomes known to the Receiving Party from a third-party source without a knowing violation of any obligation of confidentiality to the Disclosing Party with respect to such information; (c) was known by the Receiving Party prior to disclosure of such information by the Disclosing Party to the Receiving Party or its Representatives; or (d) was independently developed by the Receiving Party without any use of Confidential Information.

3. <u>No Trade</u>. Interested Party, including each of its affiliates, will not directly or indirectly buy or sell the securities of ALL Fuels & Energy Company, a Delaware corporation (symbol: AFSE.OB), at any time when it or they are privy to material inside information, which may include all or any part of the Confidential Information, until such time as the same may become publicly known.

4. Warranty. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. THE RECEIVING PARTY AGREES THAT THE DISCLOSING PARTY SHALL NOT BE LIABLE FOR ANY DAMAGES WHATSOEVER RELATING TO THE RECEIVING PARTY'S USE OF SUCH CONFIDENTIAL INFORMATION. Notwithstanding anything herein to the contrary, nothing in this agreement shall limit any rights that the Receiving Party may have pursuant to a definitive written agreement relating to the Transaction, subject to such limitations contained therein.

5. Return of Confidential Information. The Receiving Party shall immediately destroy or return all tangible and, to the extent practicable, intangible material in its possession or control embodying the Disclosing Party's Confidential Information (in any form and including, without limitation, all summaries, copies and excerpts of Confidential Information) at such time as the Disclosing Party may so request in writing and shall not thereafter be retained in any form by Receiving Party, except that notwithstanding the above, one copy may be retained by Receiving Party to show compliance with the terms of this Agreement or for regulatory compliance purposes.

12 MM 7-7-11

6. Non-Circumvention. During the term of this agreement and for a period of ~~36~~ 12 months after its termination, Interested Party hereby agrees not to, directly or indirectly, without the written consent of ALL Fuels & Energy Company: (a) solicit, contact, negotiate, or form any agreements with any of ALL Fuels & Energy Company's acquisition target, TriState Financial, LLC DBA North Country Ethanol, in bankruptcy, independent of ALL Fuels & Energy Company. Interested Party will maintain complete confidentiality regarding ALL Fuels & Energy Company's business contacts, and will disclose such Business Sources only to named parties pursuant to the express written permission of ALL Fuels & Energy Company.

7. Notice of Breach. The Receiving Party shall notify the Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information, or any other breach of this Agreement, and shall cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party regain possession of Confidential Information and prevent its further unauthorized use.

8. Publicity; Relationship. Neither party shall make any representations, give any warranties or enter into any negotiations or agreements with third parties on behalf of the other party. Each party agrees that all press releases, announcements, other forms of publicity made, or negotiations entered into, by such party concerning any joint activity or business relationship between the parties must be pre-approved in writing by the other party.

9. Non-waiver. Any failure by the Disclosing Party to enforce the Receiving Party's strict performance, or any waiver by the Disclosing Party, of any provision of this Agreement shall not constitute a waiver of the Disclosing Party's right to subsequently enforce such provision or any other provision of this Agreement.

10. No License. Nothing in this Agreement is intended to grant any rights to either party under any patent or copyright of the other party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other party except as expressly set forth herein.

11. No Obligation. Nothing in this Agreement shall impose any obligation upon either party to consummate a transaction with the other or upon either party to enter into discussions or negotiations with respect thereto.

12 MM 7-7-11

12. Non-Solicitation. During the term of this Agreement and for a period of twenty four (24) months thereafter, neither party hereto shall, directly or indirectly, recruit, solicit or otherwise induce or influence any person or entity which is, or was at any time during the term of this Agreement, a customer, supplier, employee, consultant, sales agent or independent contractor of the other party hereto or any other person or entity which has a business, agency or employment relationship with such other party or its affiliates to discontinue or reduce the extent of such relationship.

13. Term. The obligations of each Receiving Party hereunder shall survive until the earlier of (a) one year from the date of this Agreement, (b) such time as all Confidential Information disclosed hereunder is in the public domain through no fault of, action or failure to act by the Receiving Party or (c) the execution of a definitive written agreement relating to the Transaction.

14. Miscellaneous.

(a) This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law principles of such State. All actions in connection with this Agreement shall be brought only in the state or federal courts sitting in Des Moines, Iowa. Those courts shall have jurisdiction over the parties in connection with any such lawsuit and venue shall be appropriate in those courts. Process may be served in any manner permitted by the rules of the court having jurisdiction.

(b) Any notice required or permitted under this Agreement shall be in writing and delivered by personal delivery, a nationally-recognized express courier assuring overnight delivery, confirmed facsimile transmission or first-class certified or registered mail, return receipt requested, and will be deemed given (i) upon personal delivery; (ii) one (1) business day after deposit with the express courier or confirmation of receipt of facsimile; or (iii) five (5) days after deposit in the mail. Such notice shall be sent to the party for which intended at the address set forth below its signature hereto or at such other address as that party may specify in writing pursuant to this section, and, in the case of the Company, with a copy to: Dean E. Sukowatey, President, ALL Fuels & Energy Company, 6165 N.W. 86th Street, Johnston, Iowa 50131; 515.331.6509, fax 419.730.6068, dean@allfuelsandenergy.com

(c) Each party acknowledges and agrees that as of the date hereof, this Agreement is the only agreement between the parties with respect to confidentiality obligations. No provision of this Agreement shall be deemed waived, amended or modified by either party unless such waiver, amendment or modification be in writing signed by the party against whom enforcement of such waiver, amendment or modification is sought.

(d) In the event that any one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, or the validity, legality and enforceability of any one or more of the provisions contained herein shall be held to be excessively broad as to duration, activity or subject, such provision shall be construed by limiting and reducing such provision so as to be enforceable to the maximum extent compatible with applicable law.

(e) In any action to enforce any of the terms or provisions of this Agreement or on account of the breach hereof, the prevailing party shall be entitled to recover all its expenses, including, without limitation, reasonable attorneys' fees.

(f) This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

(g) Execution and delivery hereof may be evidenced by facsimile transmission.

IN WITNESS WHEREOF, the parties hereto have executed this Mutual Non-Disclosure Agreement as of the later date set forth below.

| | |
|---|---|
| ALL FUELS & ENERGY COMPANY | Mitch Miller, Energetix<br>(Name of Interested Party) |
| By:<br>Dean E. Sukowatey<br>President | By: ____________<br>Printed Name: Mitch Miller |
| dean@allfuelsandenergy.com | |
| Fax: 419.730.6068 | Fax: ____________ |
| *Date Signed: 6.27.2011* | *Date Signed:* 7-7-11 |

# EXHIBIT
# B

Energetix

Date: July 13, 2011

Project: Rosholt, SD - 25 MGY Ethanol Plant ('the Plant")

Re: Partnership Summary Term Sheet between Energetix, LLC and ALL FUELS and ENERGY (the "Parties") per phone conversations/meetings on July 8, 2011 and July 12, 2011. In attendance were Mitch Miller, Mick Miller, Jason Jerke and Dean Sukowatey.

1. Purchase the Plant for $5 MM – note from Mark Kilian with Community Business Lenders (CBL) and an additional $2 MM($1 MM plant capex (pre-start-up) and $1 MM working capital) from a SBA 7A or 504 Loan
   a. ALL FUELS primary responsibility
   b. Transaction will be 100% private, no public offering
2. Raise $4 MM equity – working capital – each $1 MM equity represents 15% ownership
   a. Energetix primary responsibility
3. Energetix, LLC and ALL FUELS – 50/50 partnership as project developers – each receive 20% equity subject to equity fund level of $4 MM (prorate any dilution or equity absorption)
4. Legal Entity – Both Parties agree to form a Limited Liability Company (LLC) with board approved language for all legal documentation, including but not limited to an Operating Agreement and Certified Articles of Organization
5. Board of Manager Positions (7 seats total)
   a. Approx 3 positions for equity – (1 position will be equal to an Operating Manager)
   b. 2 positions for Energetix – (1 position will be equal to a Operating Manager)
   c. 2 Positions for ALL FUELS – (1 position will be equal to a Operating Manager)

Energetix

6. Operating Managers. The Company shall have "Operating Managers." The Operating Managers shall initially be (i) from Equity, (ii) Energetix or such other Person appointed by Energetix, and (iii) ALL FUELS or such other Person as appointed by ALL FUELS; provided that any Person appointed by Equity, Energetix or ALL FUELS, as applicable, to be an Operating Manager, shall be acceptable to a majority of the members of the Board (such acceptance not to be unreasonably withheld). The Operating Managers shall have responsibility for the management of the day-to-day operations and activities of the Company, subject to the authority and direction of the Board, and shall have such other rights and responsibilities as are set forth in this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, including, without limitation, all references to the Operating Managers (in the plural), the Operating Managers may take action individually or jointly, as they shall determine. The Operating Managers may execute, on behalf of the Company, contracts, deeds, mortgages, bonds or other instruments.
7. Energetix provides day to day, direct oversight of all financial, marketing and production aspects for the Plant with a 24 month contract (Management Agreement)
    a. Energetix provides a General Manager (GM) and or Chief Executive Officer (CEO) for the Plant at pass through costs
    b. Energetix provides a Plant Manager (PM) for the Plant at pass through costs
    c. Board of Managers to approve salary and benefit packages for GM or CEO and PM
8. ALL FUELS shall assist with general management activities through its Operating Manager position
    a. Both Energetix and Equity will also hold one Operating Manager position on the Board of Managers to assist with general management activities
9. Management fees:
    a. Energetix receives $10,000 per month upon financial close with CBL ($5 MM loan) and successful equity raise of $2.0 million (minimum)
        i. Term is 24 months with renewal

Energetix

ii. Energetix shall employee the GM and PM and will pass through all associated employment costs to the Plant

iii. Energetix will provide additional staff for start-up and will be expensed at a reasonable cost to the Plant

b. ALL FUELS receives $10,000 per month upon financial close with CBL ($5 MM loan) and upon financial close with SBA loan ($2 MM) for a finite term of 24 months associated with ALL FUELS project development work

10. Expenses:

a. ALL FUELS will receive a onetime reimbursement in the amount of up to $200,000 upon financial close with both loans ($5 MM with CBL and $2 MM SBA) and board evaluation of appropriate expense reimbursement

b. Both Energetix and ALL FUELS agree to an expense cap of $5,000 per month each without board approval (both parties understand expenses may be higher during approx 3 month start-up/shakedown period)

c. Expenses will be reimbursed to both parties at cost with no mark-up upon sufficient monthly expense reports with supporting documentation.

IN WITNESS WHEREOF, the parties have set their hands and seals this day and year above written.

| | |
|---|---|
| ENERGETIX, LLC | ALL FUELS and ENERGY |
| ______________________ | ______________________ |
| By: Mitch Miller | By: Dean Sukowatey |
| Its: Managing Partner | Its: President and CEO |